**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **Jasmin Rowlett** | * |
| **19 Arlen Road, Apt. F** | * |
| **Nottingham, MD 21236** | * |
| | * |
| *Plaintiff*, | * |
| | * |
| | *   **Case No.: 21-1205** |
| | * |
| **v.** | * |
| | * |
| | * |
| **Baltimore City, Maryland;** | *   **JURY TRIAL DEMANDED** |
| **Baltimore Police Department** | * |
| **242 W. 29th Street** | * |
| **Baltimore, MD 21211** | * |
| | * |
| *Defendant*. | * |
| | * |
| **Serve:** | * |
| | * |
| **The Baltimore City Law Department** | * |
| **Office of Legal Affairs** | * |
| **C/O City Hall, Room 101** | * |
| **100 N. Holliday St., Suite 101** | * |
| **Baltimore, MD 21202** | * |
| | * |
| **Baltimore Police Headquarters** | * |
| **601 East Fayette St.** | * |
| **Baltimore, MD 21202** | * |
| | * |

**COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES**

COMES NOW, Plaintiff, Sergeant Jasmin Rowlett (hereinafter "Plaintiff" or "Sgt. Rowlett"), by and through her undersigned counsel Dionna Maria Lewis, Esq. complains against Defendant, Baltimore City Police Department (hereinafter "Defendant" or "BPD") and in support thereof states as follows:

1

## INTRODUCTION

1. On August 10, 2016, the Department of Justice published a scathing report about the Baltimore Police Department's widespread constitutional violations, the targeting of African Americans, and a culture of retaliation.[1] And, while the investigation and report focused largely on how Baltimore police abused the law, the people they were meant to serve, and the public trust, the complicit institutional engine that acquiesces in the destruction and demise of BPD's own Black women officers and sergeants remains pervasive, continuous, and swept under the rug. ***This case is about when the police are fearful of the police—their own brothers and sisters in blue.***

2. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII"); the Civil Rights Act of 1866, Section 1981(a) ("Section 1981"), 42 U.S.C. § 1320d-6 *et seq*.; the Americans with Disabilities Act of 1990 42 U.S.C. § 12101 *et seq*. ("ADA"); and the Maryland Fair Employment Practices Act, Md. Code § 20-601 *et seq*. (FEPA) for the Defendant's unlawful harassment, discrimination, and hostile work environment based on race (African American), sex (female), disability (disability stemming from pregnancy), retaliation (prior statutorily protected activity), and HIPAA violation against the Plaintiff.

## JURISDICTION AND VENUE

3. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws or treaties of the United

---

[1] https://www.justice.gov/opa/pr/justice-department-announces-findings-investigation-baltimore-police-department, "Justice Department Announces Findings of Investigation into Baltimore Police Department," May 17, 2021.

States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq*., and Section 1981, to redress and enjoin employment practices of the Defendant.

4. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

6. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendant transact substantial business in this District, and Defendant maintain employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

7. Plaintiff has exhausted all of her administrative remedies.

8. Plaintiff filed a charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on June 6, 2020, alleging discrimination based on race (African American), sex (female), disability (disability stemming from pregnancy) and retaliation (prior statutorily protected activity).

9. On April 15, 2021, after Plaintiff's request through her counsel, the Department of Justice ("DOJ") issued Plaintiff a Right-to-Sue Letter.

10. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

11. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

12. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of her constitutional and statutory rights.

13. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

14. Plaintiff, Sergeant Jasmin Rowlett, is an African American female who resides in Baltimore County.

15. Defendant is a municipal police force, whose jurisdiction encompasses Baltimore, Maryland, the State's largest city.

16. The Baltimore Police Department ("Defendant" or "BPD") is the 8th largest municipal police force in the United States, staffed by nearly 3,100 civilian and sworn personnel. The Department's jurisdiction covers Maryland's largest city, with a population of approximately 611,648 people.

17. Sgt. Rowlett works at the Baltimore Police Department ("BPD") and is a member of Baltimore City Lodge No. 3, Fraternal Order of Police ("FOP"), which is a Maryland corporation that is designated as the exclusive representative of Baltimore Police Officers

holding the ranks of police officer, police agent, flight officer, police sergeant, police lieutenant, and detective. The relationship between employer representative BPD and employee representative Lodge is governed by a Collective Bargaining Agreement ("CBA" or "Agreement").

18. A Memorandum of Understanding II ("MOU II") covers Unit II employees, which include Police Sergeants and Police Lieutenants.

19. The Baltimore City Lodge No. 3, Fraternal Order of Police, Unit II ("Lodge") provides labor management relations, establishes leave and salary requirements, work hours database management for those employed by the police department.

20. During the relevant period, Defendant employed Plaintiff, Sgt. Rowlett.

21. During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

22. Plaintiff, Sgt. Jasmin Rowlett, has been employed by Defendant, the Baltimore Police Department ("BPD") since September 2009 until present, as a Patrol Officer.

23. On or around August 2019, Sgt. Rowlett began working in the BPD's Northeast District as a part of an involuntary transfer after filing an EEOC complaint and a subsequent civil lawsuit against BPD for sexual harassment (prior statutorily protected activity).

24. While working as a Police Seargent in the Northeast District, Plaintiff was under the command of Major Natalie Preston (African American, female).

25. On or around the fall of 2019, Plaintiff began working with Sergeant Bradley Hood (Caucasian, male) who is of equal rank, on her shift. While working with Sgt. Hood, the Plaintiff was consistently subjected to ongoing and persistent sexual harassment from him

on a daily basis, including but not limited to, inappropriate comments of a sexual nature, such as, "I've never been with a black girl" and "I want you to be my first black girl," or words similar, as well as commenting on the Plaintiff's physique outside of her uniform. Sgt. Hood would repeatedly ask the Plaintiff out on date, and the Plaintiff repeatedly but respectfully rebuffed his advances in an effort to quell the harassing and offensive behaviors from Sgt. Hood. This harassment also extended outside of the workplace, too. After work hours, Sgt. Hood would often attempt to video call the Plaintiff while she was off-duty and send her unsolicited text messages and pictures of his feet during night-time hours. These phone calls and text messages became such a regular occurrence that the Plaintiff would prepare herself for the barrage of incoming messages each night, and the incessant invitations to meet him at a bar so he "could see what [she] was wearing," or words similar.

26. Based on reason and belief, as a result of Sgt. Hood's demeanor and language, Sgt. Hood appeared to be inebriated during many of these inappropriate and offensive night-time communications to Plaintiff.

27. When Sgt. Hood began to realize that Plaintiff was rejecting his advances, Sgt. Hood began increasing his hostile behaviors towards her in her work environment. Sgt. Hood started threatening and intimidating Plaintiff. He would demand to know why she refused to answer his phone calls or respond to his text messages. Since the Plaintiff was unsure of how to handle this behavior given the retaliation she was already experiencing from her prior statutorily-protected activity, she reported Sgt. Hood's behavior to another colleague, Sgt. Patrick Corrigan. In doing so, Plaintiff detailed Sgt. Hood's behavior to Sgt. Corrigan

and expressed that she feared for her safety and her well-being. Nevertheless, Sgt. Hood's behavior continued.

28. Then, on or around November 2019, Plaintiff reported Sgt. Hood's behavior towards her and another African American female officer, Mingyon Barrett, to Major Preston. The Plaintiff provided details of Sgt. Hood's harassing and offensive conduct, including the fact that Sgt. Hood told them that he wanted Plaintiff and Officer Barrett be "his first black girls," or words similar. Major Preston responded that this type of behavior would not be tolerated and that she would investigate it further.

29. However, there is no evidence that Major Preston followed through on this investigation as Sgt. Hood's behavior continued and escaled unimpeded and without repercussion. Sgt. Hood not only continued with his unwelcome invitations and phone calls, but he also began yelling and screaming at the Plaintiff in the workplace in front of other officers, in an effort to humiliate, intimidate, and debase her.

30. On or around March 2020, Officer Robert Mauri, one of Sgt. Hood's Officers, heard Sgt. Hood refer to the Plaintiff as a "snitch," and remark that the entire Unit is aware that the Plaintiff "likes to make complaints," or words similar. It is no secret that this was a reference to the Plaintiff's statutorily-protected EEO activity concerning the discrimination and harassment she previously experienced within BPD—protected activity that she engaged in internally within the Department's EEO process to no avail, and externally through the EEOC and this Honorable Court system. Based on reason and belief, Sgt. Hood's unlawful behavior of bullying, intimidation, and harassment accompanied with the "snitch" comments, demonstrates that Plaintiff has a target on her back and is not protected from some of the same brothers in Blue that she swore to serve and protect with.

31. On or around the end of March 2020, Sgt. Hood asked the Plaintiff "what perfume fragrance she wears so that he could buy it for his wife," or words similar. After the Plaintiff informed him of the brand, he replied "yummy." Sgt. Hood then asked if Plaintiff could wear his hoodie so that her scent would linger on it so he could "smell her when [she] wasn't around," or words similar. Out of fear for her safety, Plaintiff continued to ignore these comments and politely declined. Nevertheless, However, Sgt. Hood persisted and continued his sexually harassing behaviors—he seemed even more incited immediately after Plaintiff would reject his advances.

32. On or around January 2020, Plaintiff took a few days of sick leave to manage symptoms related to her pregnancy. To provide context, Plaintiff informed her direct supervisor, Major Natalie Preston, about her pregnancy and the severe symptoms that rendered her disabled. Major Preston informed Plaintiff that because of her newly developed disability she would allow the Plaintiff to work a modified schedule of four (4) hours per day for the duration of her pregnancy.

33. During this time, Sgt. Hood became more aggressive towards Plaintiff. For example, Sgt. Hood would enter their shared office space and initiate verbal altercations about minor issues. Sgt. Hood would also often ask the Plaintiff about specific details related to her previous EEOC cases and demanded to know how the individuals involved "got away with it," or words similar.  Additionally, Sgt. Hood would boast to Plaintiff about having connections with high ranking officers in the force, but would not disclose their names, in case he had to "use him for help."

34. Around this same time, Sgt. Hood began spreading false statements about the Plaintiff to the other officers in the Unit in an effort to alienate Plaintiff from her colleagues. As a

result of Sgt. Hood's influence coupled with his fabrications, other officers stopped interacting with Plaintiff and distancing themselves from her. This isolation in her work environment enhanced the significant amount of stress Plaintiff was already under, which impacted her physical and mental wellbeing, and exacerbated the medical conditions surrounding her already high-risk and debilitating pregnancy.

35. Then, on or around mid-March 2020, the Plaintiff arrived to work and noticed that someone had placed a toy rat on her chair. The Plaintiff was alone in the office, so she moved the toy rat from her chair and began working. A few days later, she arrived to work and saw the same toy rat placed in her desk drawer. It became clear that someone was intentionally placing the rat at her desk. The Plaintiff then wrote an administrative report (Form 95) about the toy rat and placed it in her purse to be submitted at a later time. When she arrived home that day, the Plaintiff looked in her purse and noticed that someone had removed the report.

36. Sgt. Hood later removed the toy rat from the office and ironically claimed that someone had left it on *his* desk. Sgt. Hood then filed a report with Internal Affairs documenting this accusation, in an attempt to obviate and undermine Plaintiff's own complaint alleging the same facts.

37. On or around mid-March 2020, Officer Godsmark, a former friend of Sgt. Hood, advised Plaintiff to be wary and guarded around Sgt. Hood as he had proliferated several false statements about the Plaintiff to other officers in the Unit. Plaintiff continued to grow concerned.

38. On or around March 30, 2020, at approximately 1:00 a.m., Plaintiff received an email from Major Preston stating that she was revoking the Plaintiff's pregnancy-related disability

accommodation. The Plaintiff attempted to speak with Major Preston when she arrived to work that day, but Major Preston refused to speak with her. Plaintiff had a previously approved arrangement that permitted Plaintiff to work at a reduced capacity, as an accommodation for her medical condition. However, Major Preston's email effectively revoked those accommodations, and Plaintiff was now being required to work eight (8) hour shifts, attend roll call outside in the cold and on foot while managing pregnancy-related medical conditions, and complete the entirety of the shift's administrative paperwork. No other sergeant on light duty while under the command of Major Preston was required to perform these tasks.

39. With her reasonable accommodation rescinded, along with Sgt. Hood's consistent, daily harassment, the Plaintiff's workplace worsened. To manage her own health and livelihood, Plaintiff was then forced to use sick leave in order to accommodate her own medical condition, since her pregnancy-related reasonable accommodation had been rescinded.

40. On or around April 10, 2020, Sgt. Hood sent a text message to Plaintiff that ordered her to remove her stuff from her desk because BPD was giving her desk to him. The Plaintiff questioned this directive because Sgt. Hood already had a desk so it was non-sensical that he would be directed to take hers. Sgt. Hood informed Plaintiff that he was given orders from Major Preston to take possession of the Plaintiff's desk and that he was not aware of whether Plaintiff would receive a replacement desk. The Plaintiff informed Sgt. Hood that since she is the Senior Sergeant of the Unit, he does not have her permission to take her desk. However, Sgt. Hood dismissed Plaintiff's authority and took possession of her desk, anyway.

41. As a result of Plaintiff's work environment, Plaintiff filed an internal EEOC complaint with BPD regarding the continued harassment and unlawful treatment she was receiving from both Sgt. Hood and Major Preston. In the complaint, the Plaintiff detailed the misconduct of both officers and pleaded for an immediate transfer. The Department's EEOC denied her transfer, stating that they did not have any other location to place her. In desperation, the Plaintiff contacted Sgt. Frieda Sheppard via telephone and multiple emails to plead her case regarding her hostile work environment, to no avail.

42. Then, on or around May 2020, Human Resources contacted the Plaintiff to persuade her to rescind her EEOC charges against Major Natalie Preston. They stated that if she rescinded these charges, her reasonable accommodations would be reinstated. The Plaintiff refused to rescind her EEOC charges and as a result, her reasonable accommodations were never reinstated.

43. Without any assistance to transfer her or repair her work environment, considering BPD relegated Plaintiff to continuously work with her documented harasser, the Plaintiff was forced to go out of work on a non-pay leave status. The Plaintiff and Sgt. Hood remained on the same shift during this time despite the fact that he was aware of her complaint against him. Conversely, a Caucasian male sergeant on the Plaintiff's shift received a transfer to a new district when he requested one, demonstrating that the Plaintiff was lied to and discriminated against as there clearly were vacancies available for her to be transferred. Additionally, the Defendant continued to publish job opportunities for sergeants in other departments, while continuing to refuse to transfer Plaintiff, despite her numerous complaints of sexual harassment and hostile work environment.

44. On or around July 1, 2020, the Plaintiff was scheduled to receive a $1,000.00 bonus, however, she did not it. Puzzled, Plaintiff began to inquire about the status of her bobus payment and why it was not received. Plaintiff discovered that while she was qualified to receive the bonus, the payment was not issued for reasons unknown. To this day, the Plaintiff has not been issued her earned bonus.

45. Then, on or around August 30, 2020, around the time that Plaintiff went out on maternity leave, the Plaintiff was placed in Unit 407 which is reserved for members of the Unit who are working light duty or on a medical accommodation. This placement enables officers to return to full duty more quickly, as it allows the Department to adjust hours and relocate officers around on an as-needed basis. However, historically Unit 407 did not apply to members on maternity leave.

46. On or around October 14, 2020, Sgt. Albert Rotell of the Department's Medical Section contacted the Plaintiff to discuss her placement in Unit 407. The Plaintiff inquired as to why she was placed in 407, since her situation did not apply to the historical purpose of why officers were traditionally placed there. Sgt. Rotell responded that while he was aware that she had just given birth, he was under the impression that she was out on leave due to an injury. The Plaintiff informed Sgt. Rotell that she was in fact not injured, but had returned to work from maternity leave, and he had been misinformed.

47. The Plaintiff contacted Lt. Effland, Administrative Lieutenant in the Northeast District, about her placement in 407. Lt. Effland informed the Plaintiff that she advised the Unit to not place the Plaintiff in 407, but that Major Rhoden insisted to the contrary. Lt. Effland then responded to the situation by stating, "I know you better than to think this place would do the right thing, right?" or words similar.

12

48. On or around November 2020, Sgt. Rotell contacted the Plaintiff and informed her that she had utilized all of her maternity leave. The Plaintiff was confused by this information and requested in writing how much time is allotted for maternity leave pursuant to BPD policy. After referring to the BPD policy handbook and the Plaintiff's contract, Sgt. Rotell could not find an answer. Sgt. Rotell then went on to request her home address so that Defendant could conduct home visits. When the Plaintiff inquired why this was necessary, Sgt. Rotell informed her that Major James Rhoden had given this order. Major Rhoden was the Captain in the Central District when the Plaintiff had made her previous EEOC complaints regarding sexual harassment. Under Major Rhoden's new orders, the Plaintiff was not permitted to leave her home unless it was to the grocery store or hospital, and she was required to log and report her movements to the District, and failure to obey these orders would result in disciplinary charges. Again, Plaintiff requested to be removed from 407 but was once again, denied. At this point, the Defendant was turning the victim, Sgt. Rowlett, into the villain.

49. On or around November 2020, a dispatcher from the Department sent the Plaintiff a text message stating that she heard that the Plaintiff was sexually harassed by Sgt. Hood and was being treated negatively  because she complained about it and reported his behavior. The dispatcher then sent the Plaintiff a screenshot of a text message conversation between the dispatcher and Officer Jordan Hoffman. The dispatcher asked Officer Hoffman if he remembered the exact date that Sgt. Hood approached him and requested that Officer Hoffman make false statements to the EEOC or Internal Affairs if they questioned him about the Plaintiff's sexual harassment complaint. Officer Hoffman responded that Sgt. Hood made this request around August 2020. The Plaintiff had filed her internal EEOC

complaint against Sgt. Hood in April 2020, and it was closed with no findings against him in August 2020.

50. On or around December 8, 2020, Major Derek Loefler was transferred from the Deputy Commissioner's Office to the Plaintiff's Unit. Major Loefler's career history includes working with the Deputy Commissioner as a Captain and therefore made him well-versed in the Department's policies and protocols. Shortly after Major Loefler transitioned to the Unit, Plaintiff was informed by Lt. Effland that Major Loefler had decided that the Plaintiff was wrongly placed in 407 and that it should be remedied. Despite this declaration, no changes were implemented, and Plaintiff remained.

51. On or around January 27, 2021, the Plaintiff contacted the BPD Internal Affairs Department to discuss the incident about the toy rat being placed on her desk. Detectives Alexis Emanuelli and Syreeta Harvin took the Plaintiff's recorded statement detailing this incident. Specifically, the Plaintiff provided details about how the toy rat was placed and that it was most likely Sgt. Hood who had committed this act, due to his previous treatment and harassment towards the Plaintiff. After providing this statement, the Plaintiff then inquired about whether an investigation would be conducted in regards to this complaint, to which Detective Emanuelli responded in a condescending manner, "how long have you been a sergeant?" and "I don't have to answer your question," or words similar. No formal investigation was ever conducted regarding this complaint.

52. On or around April 21, 2021, Captain Smallwood requested that the Plaintiff meet him in his office at the completion of her shift. The purpose of this meeting was to inquire about whether Plaintiff would be at the gun range the following day. While speaking to the Administrative Sergeant, the Plaintiff informed him that she could not attend because she

had misplaced her eyeglasses and therefore could not qualify to use her handgun at the gun range until she had obtained a replacement. Captain Smallwood then ordered the Administrative Sergeant to pressure Plaintiff into attending anyway, despite being informed that she would not qualify without her replacement glasses. When the Plaintiff entered Captain Smallwood's office at the end of her shift, he stated "are you Sergeant Rowlett?" to which the Plaintiff replied "yes." Captain Smallwood then inquired about the date she had made her eye appointment, and the Plaintiff replied that she had not done so yet. Captain Smallwood replied, "why not, is there something wrong with your insurance?" The Plaintiff then felt intimidated and threatened, as Captain Smallwood was speaking to her in a degrading and dehumanizing manner. The Plaintiff then further explained that she was having childcare troubles, as she is a single mother of four children, including an infant. While attempting to explain her circumstances, Captain Smallwood interrupted Plaintiff several times, spoke over her, and dismissed her concerns. Captain Smallwood ordered Plaintiff to make an eye appointment immediately, and to let him know when it was scheduled. The Plaintiff informed Captain Smallwood that her shift was complete and she was on her way home. Captain Smallwood then wrote down his number and ordered Plaintiff to call him tomorrow when her eye appointment was scheduled.

53. On or around May 11, 2021, the Plaintiff contacted Lt. Effland to inform her that the Plaintiff's mother, who cares for Plaintiff's children, was still feeling ill due to her recent COVID-19 diagnosis. The Plaintiff further informed Lt. Effland that as a result, she was unaware of how soon she could return to work. Lt. Effland responded that Plaintiff was scheduled for the gun range that Friday and informed her "you can't miss that," or words similar. Due to the previous interactions that Plaintiff had with Lt. Effland, who has acted

as a proxy on behalf of Captain Smallwood, the Plaintiff interpreted this to mean that she must attend Friday's gun range exercise, or her job would be at risk. Captain Smallwood had been pressuring Plaintiff to return to full duty status and has implied that her career is in jeopardy if she does not. Additionally, Captain Smallwood is a close acquaintance of Sgt. Yolanda Brown, an individual that Plaintiff listed as a perpetrator in previous legal proceeding. Based on reason and belief, it is Plaintiff's impression that both Captain Smallwood and Sgt. Brown are working in tandem to create a hostile work environment for the Plaintiff and force her out of the BPD.

54. To date, Plaintiff has been the target of race, sex, and pregnancy discrimination, retaliation, and workplace hostility.

55. Plaintiff has been unable to complete basic functions at work, such as breast pumping, as she feared that Sgt. Hood, her harasser, would contaminate the milk supply that is meant to provide nourishment to her infant child; Plaintiff has been unlawfully deterred from pursuing or receiving internal promotions due to the inaccurate and unlawful and baseless AWOL investigation orchestrated by Internal Affairs that was opened while she was out on maternity leave; Plaintiff has been unlawfully deterred from pursuing or receiving internal promotions as she has faced a barrage of harassing internal Charges from Internal Affairs, that has tarnished her personnel record and prevented her file from accurately reflecting her achievements; and Plaintiff has been treated observably different from other Sergeants outside of her protected classes.

56. Based on reason and belief, the Defendant intentionally placed Plaintiff in situations that would cause her significant anxiety, stress, and fear, in retaliation for her previous EEOC activity, in an effort to deter her from engaging in the process, again.

57. The Plaintiff faced continuous and relentless harassment during the entirety of her high-risk pregnancy that aggravated her symptoms and made it difficult for her to merely exist. With the lingering concern of the statistically high mortality rate of African American women during pregnancy and childbirth, the aforementioned misconduct by BPD was so egregious and pervasive, that it affected the Plaintiff's mental, emotional, and physical wellbeing in irreparable ways. The complications that the Plaintiff sustained during and after her pregnancy were exacerbated by this continuous and unlawful behavior directed towards her.

58. Plaintiff's grievances and previously filed complaints, remain unresolved which has caused her significant distress and placed her in tremendous fear in her work environment.

59. Plaintiff was forced to file suit due to the Defendant's inability to remedy their unlawful conduct, which has cost Plaintiff significant financial strain as well as emotional distress.

60. The Defendants' discriminatory and retaliatory practices have been effectuated in violation of federal and state statutes, including Title VII of the Civil Rights Act, Section 1981, the ADA, and FEPA.

## COUNT I

## VIOLATION OF TITLE VII - RACE DISCRIMINATION

61. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

62. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

17

63. Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified police officer, as she has approximately twelve (12) years on the force and maintained the title of Sergeant. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when she was harassed by Sgt. Hood of the Baltimore Police Department, making highly inappropriate comments and gestures of a sexual nature. Lastly, the above-mentioned harassment by Sgt. Hood towards the Plaintiff gives an inference of race discrimination and prejudice.

64. Plaintiff is a member of a protected class as an African American woman.

65. Because of her race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

66. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

67. Defendant knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her race.

68. Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race.

69. Defendant reprimanded Plaintiff in a way that deprived her of workplace safety and otherwise adversely affected her status as an employee because of her race.

70. Other employees who were similarly situated, but were non-Hispanic or Caucasian individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

71. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

72. Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

73. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

74. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race.

75. Defendant discriminated against Plaintiff because of her race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

76. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

77. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

78. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

79. Further, Defendant's treatment and actions are ongoing.

80. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

81. Similarly, situated non-Hispanic Caucasian employees were not subjected to the same, similar, or any adverse treatment as Plaintiff.

82. Baltimore City Police Department must comply with Title VII, but by and through their conduct, have violated Title VII.

## COUNT II

### VIOLATION OF TITLE VII – SEX DISCRIMINATION (GENDER)

83. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

84. A *prima facie* case of sex discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

85. Here, the four (4) elements of a *prima facie* case of sex discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class. The Plaintiff is a qualified police officer, as she has approximately twelve (12) years on the force and maintained the title of Sergeant. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized

under Title VII while working with Sgt. Hood and Major Preston where she was subjected to ongoing sexual harassment, including but not limited to, highly inappropriate and offensive sexual comments and invitations. The Plaintiff faced discrimination when her sexual harassment claims were dismissed; when her transfer was denied due to a lack of vacancies even though another officer was later transferred to another unit; when her pregnancy disability reasonable accommodations were rescinded; when she was incorrectly and unlawfully informed that she had exhausted her maternity leave days when she had not; and when she was incorrectly placed in 407. The above-mentioned actions by the Defendants towards the Plaintiff demonstrates the discriminatory and prejudicial manner in which the Defendants treated the Plaintiff and her lawful claims against them.

86. Defendant treated Plaintiff less favorably than similarly situated male employees.

87. Because of her sex, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Title VII.

88. Defendant's foregoing unlawful adverse actions materially affected the terms, privileges and conditions of Plaintiff's employment.

89. Defendant knew that Plaintiff was a woman prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her sex.

90. Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her sex.

91. Defendant has limited, segregated and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee because of her sex.

92. Other employees who were similarly situated, but members of a class (men) different than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

93. Plaintiff's sex was a determining factor in Defendant's unlawful conduct toward Plaintiff.

94. Plaintiff's sex was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

95. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

96. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her sex.

97. Defendant discriminated against Plaintiff because of her sex by engaging in, tolerating or failing to prevent sex discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

98. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

99. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

100.    Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

101.    Further, Defendant's treatment and actions were ongoing.

102.     Plaintiff has incurred lost wages, loss of reputation now and into the future, and all
of the other losses stated with Plaintiff not contributing in any way thereto.

**COUNT III**

**VIOLATION OF TITLE VII – SEXUAL HARASSMENT (HOSTILE WORK ENVIRONMENT)**

103.     Plaintiff incorporates all information and allegations contained in the preceding
paragraphs as if fully set forth herein.

104.     When hostile work environment is alleged to have occurred as a result of
unlawful discrimination, the Complainant must show that: (1) she belongs to a statutorily
protected class; (2) she was subjected to harassment in the form of unwelcome verbal or
physical conduct; (3) the harassment complained of was based on her statutorily
protected class; (4) the harassment affected a term or condition of employment[2] and/or
had the purpose or effect of unreasonably interfering with the work environment and/or
creating an intimidating, hostile, or offensive work environment; and (5) there is a basis
for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982);
*Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16,
1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

105.     Here, the five (5) elements of a *prima facie* case of a hostile work environment are
met. The Plaintiff belongs to a statutorily protected class as African American, and a
woman. The Plaintiff was subjected to harassment in the form of unlawful and
inappropriate verbal conduct, gestures, and invitations. Sgt. Hood would also make false

---

[2] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

statements about the Plaintiff to other officers in the unit, including that the Plaintiff could not be trusted because of her past history of making EEOC complaints, in an effort to alienate the Plaintiff from her colleagues. This harassment affected several terms and conditions of the Plaintiff's employment, namely where the Plaintiff was severely negatively impacted by Sgt. Hood's conduct. There is a basis for imputing liability, where Sgt. Hood, acting on the Defendants behalf, subjected the Plaintiff to the above-mentioned harassment, because of her statutorily protected class as an African American woman.

106.    The actions and conduct of the Defendant as set forth herein created a hostile, offensive, and intimidating work environment and detrimentally affected Plaintiff.

107.    The actions and conduct by the Defendant as set forth herein were severe, hostile, and pervasive and constituted discrimination based on sex and race.

108.    The actions and conduct described herein would have detrimentally affected a reasonable person of the same sex and race in Plaintiff's position.

109.    Defendant knew or should have known of the hostile work environment described herein. Defendant has failed to address the problems and further failed to implement effective and appropriate measures to stop the hostile work environment.

110.    By failing to protect Plaintiff within the Department; and by allowing for Caucasian male employees to receive more favorable treatment than Plaintiff in the terms and conditions of employment, Defendant exacerbated the hostile work environment suffered by Plaintiff, and intentionally discriminated against Plaintiff in violation of Title VII.

111.    Defendant's actions, and failure to act, amounted to discrimination based on race and sex under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment

abrogates the states' Eleventh Amendment sovereign immunity. Title VII, through the 1972 amendment known as the Equal Employment Opportunity Act ("EEOA"), provides an enforcement remedy for equal protection violations of state employees through Section 5 of the Fourteenth Amendment.

112.     As a direct result of Defendant's above-mentioned unlawful acts, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress.

## COUNT IV

### VIOLATION OF TITLE VII – RETALIATION

113.     Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

114.     Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

115.     Here, the Plaintiff faced retaliation for the complaint she submitted internally with the Department, and then externally with the EEOC in 2020, alleging discrimination. Notably, Plaintiff had previously engaged in statutorily-protected activity, which resulted in a civil lawsuit that was resolved outside of Court.

116.     Defendant subjected Plaintiff to the aforementioned adverse employment actions because of her opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII.

117.     Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEOC representative, or otherwise should have known that Plaintiff engaged in the complaint process based on her informal and formal complaint filings.

118.     The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

119.     Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

120.     Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

121.     Similarly situated employees (no known prior EEOC activity) were not subjected to the same, similar, or any adverse treatment.

122.     Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

123.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

124.     Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

125.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

126.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

127.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages - including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs - and is entitled to all available legal and equitable remedies.

128.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

129.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

130.     The Baltimore City Police Department must comply with Title VII, and by and through their conduct, violated the law.

131.     The reasons proffered by Defendants for their unlawful conduct are pretextual and Defendants cannot offer any legitimate reason for their unlawful conduct.

132.     Defendant is directly liable for the discriminatory acts or omissions of its employees while acting within the court and scope of their employment, under the theory of *Respondeat Superior*.

133.     Defendants actions were intentional, reckless, and malicious.

134.     As a direct and proximate cause of Defendants' conduct alleged throughout this complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages—including but not limited to past and future loss of income, benefits, and career opportunities—and is entitles to all available legal and equitable remedies.

135.     Plaintiff was humiliated, embarrassed, and made to ensure a great amount of pain and suffering. Plaintiff's injury is permanent in nature. Further, Defendants actions were ongoing.

136.     Plaintiff has incurred lost wages, loss of reputation, defamation of character now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

## COUNT V

### VIOLATION OF SECTION 1981

137.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

138.     As an African American, Plaintiff is a member of a protected class.

139.     Because of her race (African American), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1981.

140.     Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiffs employment.

141.    Defendant knew that Plaintiff is an African American prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of her race.

142.    Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race (African American).

143.    Defendant has limited, segregated, and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee, because of her race (African American).

144.    Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than the Plaintiff in the terms and conditions of employment.

145.    Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

146.    The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

147.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American).

**<u>COUNT VI</u>**

**VIOLATION OF THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)**

148.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

149.    Plaintiff is an individual who is protected under the privacy laws stipulated in the Health Insurance Portability and Accountability Act ("HIPAA").

150.    Plaintiff's health information is protected under the privacy laws stipulated in the Health Insurance Portability and Accountability Act.

151.    In March 2020, the Plaintiff was exposed to an individual who was infected with COVID-19.

152.    The Plaintiff's exposure to this deadly virus required her to take COVID-19 leave from work so that she could self-quarantine for the protection of herself and others.

153.    The Defendant demanded documentation and proof that the Plaintiff had indeed been exposed to a person who was infected with COVID-19 in violation of HIPPA.

154.    The Defendants' requests violated the Plaintiff's rights to privacy regarding her health information.

155.    The Defendant's conduct in requesting this information was not only unlawful, but the objective was to intimidate and demean the Plaintiff into being subservient and submitting information that she had no legal obligation to provide to management or anyone outside of Human Resources.

## COUNT VII

**VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT (FEPA)**

156.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

157.    The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 et seq. outlaws discrimination in employment based on race, color,

religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

158.     Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions.   Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

159.     Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

160.     Here, the Plaintiff was subjected to harassment or offensive conduct that is based on race and sex, where she was subjected to ongoing sexual harassment, including but not limited to, highly inappropriate and offensive sexual comments. The Plaintiff was subjected to harassment in the form of unlawful and inappropriate verbal conduct, gestures, and invitations. The Plaintiff faced discrimination when her sexual harassment claims were dismissed; when her transfer was denied due to a lack of vacancies even though another officer was later transferred to another unit; when her pregnancy disability reasonable accommodations were rescinded; when she was incorrectly and unlawfully informed that she had exhausted her maternity leave days when she had not; and when she was incorrectly placed in 407. The above-mentioned actions by the Defendants towards the Plaintiff demonstrates the discriminatory and prejudicial manner in which the Defendants treated the Plaintiff and her lawful claims against them.

161.     The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American) and sex (female).

## COUNT VII

## DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA")

162.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

163.     The ADA prohibits discrimination based on disability. *See* 42 U.S.C. § 12101 *et seq*. The ADA requires that covered employers to provide reasonable accommodations to employees with disabilities.

164.     The Defendant was aware of her medical complications and her disability status and did not provide reasonable accommodations during or after her pregnancy, and it failed to engage in the interactive process.

165.     Additionally, Defendant failed to provide reasonable accommodations to Plaintiff when they removed her from light duty and required the Plaintiff to: 1). report for work for eight (8) hours; 2). attend roll call outside, in the cold, on foot; and 3). complete all of the shift's administrative paperwork.

166.     The Defendant used this disability status to harass, demean, degrade, and humiliate the Plaintiff.

167.     The Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

## COUNT VIII

## PREGNANCY DISCRIMINATION ACT OF 1978 ("PDA")

168.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

169.     The Pregnancy Discrimination Act (PDA) forbids discrimination based on pregnancy when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, such as leave and health insurance, and any other term or condition of employment.

170.     Specifically, section 701 of Title VII of the Civil Rights Act of 1964 was amended to add the new subsection: "(k) The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise…"

171.     The PDA requires that covered employers, such as Defendant, treat pregnant employees fairly and equitably.

172.     Here, Defendant was aware of Plaintiff's pregnancy and her pregnancy-related medical complications.

173.     The Defendant used her pregnancy status to harass, demean, degrade, and humiliate her and Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Sergeant Jasmin Rowlett, respectfully prays that this Court grant her the following relief:

a. Enter a declaratory judgement finding that the foregoing actions of Defendant violated Title VII, Section 1981, ADA, HIPPA, and FEPA;

b. Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c. Award back pay and compensatory damages in the amount of $10,000,000 (ten-million dollars and zero cents) that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e. Order such other relief as this Court deems just and equitable.


## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: May 17, 2021

Respectfully submitted,

_____

Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 19486
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Jasmin Rowlett*