**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **JASMIN ROWLETT**, | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | |
| | * | Civil No. 21-1205-BPG |
| **BALTIMORE CITY POLICE** | | |
| **DEPARTMENT**, | * | |
| | | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Jasmin Rowlett ("Plaintiff") filed suit against her employer, the Baltimore City Police Department ("Defendant" or "BPD") alleging various claims of employment discrimination and retaliation.  ECF 1.  Before the Court is Defendant Baltimore City Police Department's ("Defendant's" or "the BPD's") pending motion for summary judgment, ECF 52 (hereinafter "the Motion").[1]  The Motion includes a memorandum of law and exhibits.[2]  The Court has reviewed all relevant filings, including Plaintiff's opposition, ECF 53, and the BPD's reply, ECF 56, and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  Accordingly, for the reasons stated below, the BPD's Motion is **GRANTED**.

## I.   BACKGROUND

Plaintiff is an African American woman who has been employed by the BPD since 2009.  ECF 53-6, at 5.  She worked as a "regular patrol officer" in the Southern District until 2016.  *Id.*

---

[1] The Motion at issue supersedes an earlier motion for summary judgment, ECF 43.  That earlier motion, ECF 43, is denied as moot.

[2] The Court references all filings by their respective ECF numbers and ECF-generated page numbers.

Plaintiff was then promoted to sergeant and transferred to the Central District, where she worked until 2018.  *Id.* at 7.  In 2019, Plaintiff transferred to the Northeastern District after a period of medical leave.  *Id.* at 9.  As of her deposition in April 2022, Plaintiff is still a sergeant in the Northeastern District.  *Id.* at 10.  Plaintiff's duties as a sergeant include "attend[ing] roll call, coordinat[ing] vehicles for her subordinate officers, and inform[ing] these officers of their assignments for the day," as well as "log[ging] her work into a computer, answer[ing] calls for service, provid[ing] location support to subordinate officers, . . . ensur[ing] that subordinate officers are fulfilling their duties," and "reading and signing reports authored by her subordinates."  ECF 53-2, at 2.  Plaintiff has had several supervisors in the Northeastern, but Lieutenant Effland ("Lt. Effland") was her direct supervisor for most of Plaintiff's time there, and Lieutenant Merino ("Lt. Merino") was Plaintiff's supervisor for a short amount of time after that.  ECF 53-6, at 10–11.  Major Natalie Preston ("Maj. Preston") was the major in the Northeastern until October 2020. *Id.* at 11.

From December 17 through December 28, 2019, Plaintiff was working "out-of-title" as a lieutenant.  ECF 52-4, at 11.  Around this time, Plaintiff found out she was pregnant and due in August 2020.  ECF 53-6, at 24.  Plaintiff worked only three days between December 31, 2019, and February 2, 2020.  ECF 52-5, at 1–2; ECF 53-2, at 3.  The bulk of these absences were categorized as unscheduled Leave Without Pay ("LWOP").  ECF 52-5, at 1–2; ECF 53-2, at 3–4.  On January 22, 2020, Plaintiff texted Maj. Preston: "Hey Major…I want you to know I'm not ignoring you. I'm sick as a dog."  ECF 52-6, at 30.  Plaintiff and Maj. Preston met in Maj. Preston's office on February 1, 2020, and Plaintiff told Maj. Preston that she was pregnant.  ECF 53-6, at 25–26; ECF 52-6, at 2.  Following that meeting, Maj. Preston permitted Plaintiff to work four hours of her

eight-hour shifts performing only administrative duties, while still getting paid for full-time work. ECF 53-6, at 25–26; ECF 52-6, at 2.

BPDPolicy 1725 (Pregnancy) permits pregnant officers to work an alternate "maternity duty" assignment instead of full duty if "the member so requests in writing and presents a letter from her treating physician outlining any restrictions on the member's ability to perform in her current assignment." ECF 52-9, at 1. When a pregnant officer informs the officer's Command about the pregnancy, "Command shall notify [Human Resources Section ("HR")]" immediately. *Id.* Then, HR employees will inform the pregnant officer of their accommodation options. *Id.* Ultimately, "[t]he Commanding Officer of the affected member shall make the determination, regarding the member's assignment." *Id.* at 2. Policy 1725 further describes that the "Maternity Duty Option" is available "upon written recommendation of a physician." *Id.* "Absent specific medical considerations, members working maternity duty shall continue in a full-time working status. Consideration will be given to allow for part-time assignments of members whose medical condition may warrant such accommodation." *Id.*

On February 4, 2020, Maj. Preston instructed Plaintiff to finish her seven outstanding use-of-force reports ("UOFs"), and Plaintiff acknowledged the instruction. EF 52-7, at 73. UOFs are reports detailing how and why a police officer used force on a member of the public. ECF 52-6, at 3; ECF 53-2, at 6. UOFs are used in internal review processes, external review processes like the Consent Decree, and criminal prosecutions. ECF 52-6, at 3; ECF 53-2, at 6. Some of Plaintiff's outstanding UOFs extended back to her time at the Central District from which she transferred in 2018. ECF 52-7, at 78–79; ECF 52-7, at 97. Maj. Preston again instructed Plaintiff to complete her UOFs in late February. ECF 52-7, at 79. Plaintiff maintains that she had been working on them and that it was common for BPD officers to have outstanding UOFs. ECF 53-2, at 7.

Plaintiff and Maj. Preston continued to communicate regarding Plaintiff's pregnancy and her outstanding UOFs through March.  On March 8, 2020, Maj. Preston asked Plaintiff for documentation to support her pregnancy-based accommodation request.  ECF 52-6, at 3.  On March 21, 2020, Maj. Preston texted Plaintiff, again instructing her to complete her UOFs and setting March 25, 2020, as the deadline.  ECF 52-6, at 48.  On March 26, 2020, Plaintiff signed a settlement agreement regarding an unrelated complaint she had previously filed in this Court.  ECF 12.  On March 29, Maj. Preston emailed Plaintiff the following:

> I made a request that you bring in documentation to support your request for a reasonable accommodation and as of this date, I have yet to receive the requested information.  Until I receive the information that I requested regarding your accommodation request is received [sic], and we meet to discuss if and how I may be able to accommodate you in the future,  you are required to work with your shift 094 for the entire shift, attend roll call/report to shift commander, follow your same leave group, and your shift schedule.  In addition, you will complete all administrative duties of your shift, to include the review and completeness of reports taken during your shift, the entry and update of lotus notes, and any other administrative duties deemed necessary by your Lieutenant and shift commander.

ECF 52-8, at 2.  Maj. Preston also noted "you need to work on your delinquent UOF from the central district, your notes are not acceptable," and reminded Plaintiff that she had missed the March 25, 2020, deadline for submitting the reports.  *Id.*  On March 31, 2020, Plaintiff responded:

> During our phone call where you requested documentation for my accommodation, I advised you that I had a doctors appointment on March 26, 2020 where I would request a note from my doctor and you said that would be fine. That task has been completed as you asked and is attached below.

*Id.* at 1.  Attached to Plaintiff's email was a note on Perinatal Associates at GBMC letterhead dated "3/30/2020" and signed by Noel A Benny, MA.  *Id.* at 3.  The note states in its entirety:

> Jasmin Rowlett is an obstetrical patient under my care with an EDD of August 01, 2020.  She had an appointment in our office on 03/26/20. It is in my medical opinion that Ms. Rowlett reduce her hours worked to 4hr/day secondary to sciatica pain.
>
> If you have any questions, please contact our office.

*Id.*  Plaintiff reports that she worked four hours on March 31, 2020, and then "left."  ECF 53-6, at 30.  Plaintiff testified that she did not return to work after that because she "had no choice but to go out on medical" because Maj. Preston had not responded to her email that she had sent earlier in the day.  ECF 53-6, at 29–30.

The next day, April 1, Plaintiff "called the front desk" at the Northeastern District and notified the phone operator that she was "calling out."  *Id.* at 32.  Though Plaintiff does not recall specifically, she acknowledges that she may have told the operator that she was not returning to work until an "unknown return date."  *Id.*  BPD records reflect that Plaintiff took sick leave on April 1 and was placed on "LWOP - Sick Unscheduled" for the remainder of the year.  *Id.* at 32; ECF 52-5, at 5–18; ECF 53-2, at 15 ("Plaintiff admits that she was out of work on LWOP status from April 1, 2020 – December 31, 2020.").  Plaintiff contends that she chose not to return because of the "toxic, hazardous and stressful work environment" created by Maj. Preston and because of her fear of contracting COVID-19.  ECF 52-7, at 10–11; ECF 52-12, at 2.

Plaintiff alleges that in April of 2020, while she was "out" on leave, Sergeant Hood ("Sgt. Hood")—whom she had previously accused of sexually harassing her since November 2019— texted her to inform her that Maj. Preston had ordered Sgt. Hood to take over her desk.[3]  ECF 53- 6, at 36–37.  Plaintiff testified that she informed Maj. Preston of that alleged sexual harassment in November 2019.  *Id.* at 37.

On April 16, 2020, Plaintiff filed a complaint against Maj. Preston and Sgt. Hood with the BPD's Equal Opportunity Diversity Section ("EODS").  ECF 52-7, at 1.  On April 22, Plaintiff reached out to HR "to see how [she] can start receiving pay again" as she was "currently out of

---

[3] Plaintiff references these text messages in her deposition but has not provided the Court with a copy of them.

work in a no pay status due to an extremely high risk pregnancy and fear of contracting COVID 19 with lack of safe working environment within the department."  ECF 52-12, at 2.  That same day, HR informed Plaintiff that she could apply for FMLA or an accommodation under the ADA. *Id.* at 1.  Plaintiff expressly declined to use FMLA "until it is time for me to go out on maternity leave."  ECF 52-7, at 33.  Plaintiff further requested "a safe working condition under these circumstances of COVID 19 [and] for permanent relief from working under the command of Major Preston."  *Id.*

Plaintiff testified in her deposition that "maybe in April or May of 2020," but "shortly after [she] filed [her] complaint against Maj. Preston," she received a call from "someone in HR" who told Plaintiff that her accommodation request would be granted if she dropped her complaint against Maj. Preston.  ECF 53-6, at 33.  Plaintiff could not recall the name of the caller but guessed at the caller's identity several times in the deposition.  *Id.*  Plaintiff had no knowledge of "anyone else being on the phone" during the call and noted that she "honestly [did] not know what [the caller's] role [was]."  *Id.*  Plaintiff noted that the caller "knew [Plaintiff] was requesting an accommodation due to [Plaintiff's] pregnancy" and told Plaintiff "that if [Plaintiff] closed out [her] complaint against Maj. Preston that they would go ahead and reinstate [her] accommodation."  *Id.* When pressed, Plaintiff again noted that she did not "even know who" the caller was but guessed that word of Plaintiff's complaint had "leaked" and that the caller had learned of the complaint from the "sergeant in charge of EEOC[.]"  *Id.*  Despite the call, Plaintiff did not withdraw her EODS complaint against Maj. Preston.

On May 7, 2020, EODS emailed Plaintiff a letter which included an accommodation of "five hours a day in the office" and an office location "in full seclusion with no contact with other members, enforcing social distancing from other members while at work" as well as personal

protective equipment to protect against COVID-19.  ECF 52-13, at 1–2.  The letter noted that Plaintiff would be responsible for "review[ing]/respond[ing] to reports submitted by the Officers." *Id.* at 2.  The letter also informed Plaintiff that Maj. Preston and Sgt. Hood had been informed of Plaintiff's EODS investigation and reminded of the BPD's retaliation policy.  *Id.*  Plaintiff disputes that this letter granted her an accommodation.  ECF 53-2, at 15.

On June 6, 2020, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  ECF 10-3.  On June 30, 2020, Plaintiff gave birth prematurely.  ECF 53-6, at 24.  Plaintiff remained out of work on "LWOP – Sick Unscheduled" for the rest of 2020.  ECF 52-5, at 5–18.  She did not formally apply for FMLA leave after she gave birth or after BPD sent her FMLA paperwork on November 23, 2020.[4]  ECF 52-19, at 1–2; ECF 52-23, at 1.

Plaintiff returned to work in the Northeastern District on March 16, 2021, with a doctor's note clearing her to "return back to work with no restrictions." ECF 52-24, at 1–3.  Maj. Preston no longer worked at the Northeastern, as she had left in October 2020.  ECF 56-2, at 1.  Plaintiff reports that she "had no desk" and resorted to "desk hopping" and that other officers kept "hiding the keyboards and their mouse so [Plaintiff] couldn't use the computer" and other supervisors locked their office doors to prevent her from using their offices.  ECF 53-7, at 5–6.

Plaintiff brought this suit on May 17, 2021, against her employer, the BPD, alleging the following claims: violation of Title VII of the Civil Rights Act of 1964 ("Title VII")—race discrimination (Count I), violation of Title VII—sex/gender discrimination (Count II), violation

---

[4] Plaintiff replied to the BPD's November email on December 18, 2020, informing the BPD that her doctor's office had "experienced a cyber attack recently," making it difficult for her to complete the FMLA paperwork.  ECF 52-21, at 1.

of Title VII—sexual harassment (hostile work environment) (Count III), violation of Title VII—retaliation (Count IV), violation of Section 1981 (Count V), violation of the Health Insurance Portability and Accountability Act ("HIPAA") (Count VI), violation of the Maryland Fair Employment Practices Act ("FEPA") (Count VII),  violation of the Americans with Disabilities Act ("ADA") (Count IX),[5] and violation of the Pregnancy Discrimination Act of 1978 ("PDA") (Count VIII).   ECF 1.

On November 2, 2021, Judge Gallagher dismissed Count V (§ 1981) and Count VI (HIPAA) for failure to state a claim.  ECF 16, at 14–15.  Judge Gallagher disposed of Counts I–III (the Title VII claims based on race discrimination, sex/gender discrimination, and hostile work environment) on summary judgment because the conduct alleged therein occurred before the execution of the settlement agreement between the parties on March 26, 2020, in which Plaintiff released the BPD from all claims that occurred prior to that date.  ECF 16, at 7–9.  Additionally, Judge Gallagher dismissed all claims related to a number of factual allegations for failure to exhaust administrative remedies because they were not within the scope of her EEOC charge.  ECF 16, at 11.  Those factual allegations included:

> the failure of an unknown individual to pay her a $1,000 bonus; the decision, apparently by Major James Rhoden, to place her in Unit 407 while on maternity leave and to impose certain reporting requirements; the decision by Internal Affairs to close its investigation of Sgt. Hood and not to further investigate her claims of a toy rat on her desk, and; Captain Smallwood's and Lt. Effland's efforts to ensure that Plaintiff qualified at the gun range.

*Id.*

---

[5] Plaintiff mistakenly includes two claims labeled "Count VII" in the complaint.  ECF 1, at 30, 32.  Judge Gallagher "re-numbered the pregnancy and disability discrimination claims as Counts VIII and IX" "[f]or ease of reference."  ECF 16, at 16 n.4.  I have followed her lead and re-numbered the ADA claim (the second "Count VII") as Count IX.

Four claims survive: (1) violation of Title VII—retaliation (Count IV) as it relates to Maj. Preston revoking Plaintiff's accommodation in late March 2020 without engaging in the interactive process and "order[ing] Sgt. Hood to take possession of Plaintiff's desk in April, 2020, . . . and [to] Human Resources pressur[ing] Plaintiff to rescind her EEOC charge against Major Preston in exchange for reinstating her reasonable accommodation," ECF 16, at 9–11; (2) violation of the FEPA (Count VII), ECF 16, at 16; (3) disability discrimination under the ADA for failure to engage in the interactive process to provide reasonable accommodations based on the rescission (Count IX), ECF 16, at 11–13; and (4) pregnancy discrimination under the PDA for the same conduct (Count VIII), ECF 16, at 11–13.  These claims are the subject of the BPD's Motion for Summary Judgment filed on August 12, 2022, pending before the Court.  ECF 52.

The Motion includes a memorandum in support.  ECF 52-2.  To its Motion, Defendant also attached numerous exhibits including: excerpts of Plaintiff's deposition (ECF 52-3); Plaintiff's timecards (ECFs 52-4, 52-5); declarations/affidavits of Maj. Preston (ECF 52-6), Lt. Trevor Curtis (ECF 52-10), Karen Tyler, Deputy Director of HR (ECF 52-14), and Sgt. Albert Rotell (ECF 52-17); BPD policies for Pregnancy (ECF 52-9), Accommodation Procedure (ECF 52-11), Medical Policy (ECF 52-18), and Leave of Absence Without Pay (ECF 52-22); numerous emails (ECFs 52-8, 52-12, 52-13, 52-15, 52-19, 52-20, 52-21, 52-23, 52-24); the EODS report regarding Plaintiff's complaint filed on April 16, 2020 (ECF 52-7); and a Human Resources Order dated August 28, 2020 including inter-department transfers and promotions (ECF 52-16).

Plaintiff responded in opposition on August 26, 2022, ECF 53, including a memorandum in support, ECF 53-1, as well as a separate document outlining Plaintiff's response to Defendant's Statement of Undisputed Facts, ECF 53-2.  Plaintiff also attached numerous exhibits to her opposition including resubmissions of some of Defendant's exhibits (ECFs 53-10, 53-11, 53-18,

53-19, 53-20, 53-21, 53-22, 53-23, 53-24, 53-25, 53-26, and 53-27).  Plaintiff also submitted her

own exhibits including the transcript of Plaintiff's entire deposition (ECFs 53-6, 53-7);

declarations from Sgt. Danika Yampierre (ECF 53-8) and Sgt. Welai Grant (ECF 53-9); letters

from Plaintiff's therapist (ECF 53-12) and primary care provider (ECF 53-13); Plaintiff's medical

work note (ECF 53-14); photos of Plaintiff's desk (ECF 53-15); texts about the toy rat (ECF 53-

16); and Plaintiff's June 7, 2021, and June 8, 2021, internal complaints (ECF 53-17).[6]

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure ("FRCP") 56(a) provides that summary judgment should

be granted "if the movant shows that there is no genuine dispute as to any *material* fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  "A

dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"

*Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging

Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome

of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson*,

477 U.S. at 247–48 (emphasis in original).  The Court must view the evidence in the light most

favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Tolan

v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007).  This

includes "questions of credibility and of the weigh to be accorded to particular evidence."  *Masson

v. New Yorker Mag.*, 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255).  "[I]n the face

---

[6] Plaintiff wrote these internal complaints after this lawsuit was filed on May 17, 2021.  In addition
to several of the claims having already been disposed of by summary judgment or dismissal (ECF
16), Plaintiff has never amended the complaint to include these allegations.  As such, they are not
properly before the Court in this lawsuit.

of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658–59 (4th Cir. 2020); *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) ("[The nonmoving party's] self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment."); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) ("Although we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [the plaintiff's] self-serving testimony."). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting the pre-2007 version of Fed. R. Civ. P. 56(e)).

## III.  <u>ANALYSIS</u>

There are no genuine issues of fact for trial, and the BPD is entitled to summary judgment as a matter of law as to Plaintiff's remaining claims, including the Title VII retaliation claims (Count IV), the ADA claim (Count IX), the PDA claim (Count VIII), and the FEPA claims (Count VII).  The Court addresses each below.

A.        **Title VII Retaliation**

Title VII of the Civil Rights Act of 1964 "prohibits an employer . . . from discriminating against 'any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Angelini*, 464 F. Supp. 3d at 776 (quoting 42 U.S.C. § 2000e–2).  "Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participating in a Title VII investigation or proceeding." *Id.* (citing 42 U.S.C. § 2000e–3).  An employer retaliates against an employee in violation of Title VII when the employer takes an adverse employment action against the employee because of the employee's participation in a Title VII action.  *Angelini*, 464 F. Supp. 3d at 776–77.

A plaintiff may prove retaliation either through direct evidence—the traditional approach—or through the burden-shifting *McDonnell Douglas* framework.  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).  Once a plaintiff establishes a prima facie case of discrimination or retaliation, the burden of production shifts to the employer to offer a legitimate, nondiscriminatory reason for the allegedly improper actions.  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *Merritt v. Old Dominion Freight Line, Inc.* 601 F.3d 289, 294 (4th Cir. 2010); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).  If the employer fails to meet this burden, then the factfinder may "infer discriminatory animus."  *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579–80 (1978).  But if the employer does successfully rebut the prima facie case, then the plaintiff must prove both that the proffered reason was pretextual and that the true reason for the action was discrimination.  *Burdine*, 450 U.S. at 253.  Even under the *McDonnell Douglas* burden-shifting framework, the burden of persuasion ultimately resides with the plaintiff.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

Here, Plaintiff concedes that her claims should be reviewed under the *McDonnell Douglas* framework because there "is no direct evidence of discrimination," so she must first establish a prima facie case.  ECF 53-1, at 8.  A plaintiff must satisfy three elements to establish a prima facie retaliation case: "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005).   Participation in a Title VII process constitutes protected activity when the person allegedly facing retaliation "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII.  42. U.S.C. § 2000e–3(a).

There appears to be no dispute that Plaintiff engaged in a protected activity.  "[P]rotected activit[ies]" include "participation" in any formal investigation or proceeding regarding alleged violations of Title VII and also include informal "opposition" to discrimination in the workplace. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); s*ee also Navy Fed. Credit Union*, 424 F.3d at 406.   Plaintiff alleges that she complained to Maj. Preston about both sexual harassment and filed a complaint against Maj. Preston alleging "pregnancy discrimination."   ECF 52-7.  These actions are unquestionably protected, and neither party disagrees that they occurred. As such, neither party disputes that Plaintiff has established the first requirement of a prima facie retaliation case.

There is, however, a disagreement as to whether Defendant took an adverse employment action against Plaintiff because Plaintiff engaged in protected activities.   There is further disagreement as to whether, assuming an adverse employment action occurred, such action is causally linked to Plaintiff's protected activity.

The standard for what constitutes an adverse employment action is more lenient in the retaliation context than in a discrimination context.[7] *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*").  In retaliation cases, an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" is considered to be an adverse employment action. *Burlington Northern*, 548 at 68.  "[R]etaliatory actions need not 'affect the terms and conditions of employment' to come within Title VII's prohibition . . . [but] have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (quoting *Burlington Northern*, 548 U.S. at 63–64, 68).  However, "while the realm of adverse actions for Title VII retaliation claims is broader than for disparate treatment claims, it is not limitless, and 'normally petty slights, minor annoyances, and simple lack of good manners' will not qualify." *Handley v. Baltimore Police Dep't*, No. DLB-20-1054, 2022 WL 3700871, at *11 (D. Md. Aug. 26, 2022) (quoting *Burlington Northern*, 548 U.S. at 68).  "This is so because Title VII's 'antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" *Id.*  (quoting *Burlington Northern*, 548 U.S. at 67).

Courts have found that "[e]ven with this lower bar, none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an "Attendance Warning,"' a verbal

---

[7] An adverse employment action in the discrimination context is one that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).  Classic examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibilities, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (quoting *Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011)).

If an adverse action occurred, Plaintiff still must show a causal connection between that action and the and the protected activity. *Navy Fed. Credit Union*, 424 F.3d at 405–06. To establish causation under Title VII, a plaintiff must establish that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). However, "[a]t the summary judgment stage, the plaintiff need not conclusively establish causality, but [she] must put forth some 'evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action.'" *Angelini*, 464 F. Supp. 3d at 791 (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

All direct Title VII discrimination claims were dismissed by Judge Gallagher. ECF 16, at 7–9. As such, I will address whether Plaintiff has met the disputed elements of a prima facie case under *McDonnell Douglas* for each of the three remaining Title VII retaliation claims.

### 1.    Rescission of Pregnancy Accommodation

Defendant argues that Plaintiff's Title VII retaliation claim must fail because Plaintiff never had an official accommodation in the first place. ECF 52-2, at 28–29. Stated differently, Defendant argues that no adverse employment action occurred in revoking Plaintiff's flexible schedule because the arrangement did not constitute an accommodation. In Defendant's estimation, because Maj. Preston did not have the authority to give Plaintiff an accommodation under the BPD's policies, Plaintiff did not have an accommodation that could be rescinded in the late March email, and Maj. Preston was merely asking for documentation to justify Plaintiff's half-time schedule with full pay. ECF 52-2, at 29. Defendant further argues that Plaintiff *did* receive

an accommodation on May 7, 2020, but that it was Plaintiff who failed to engage in the interactive process.  ECF 52-2, at 32–33.

Plaintiff counters that she has established a prima facie case of retaliation because her pregnancy accommodation was rescinded in retaliation for her complaining about alleged sexual harassment.  ECF 53-1, at 22.  According to Plaintiff, the Court has already definitively determined that "a rescission of accommodation, having her desk stripped of her belongings by the individual accused of sexually harassing her, and HR's attempt to barter Plaintiff's EEOC Complaint with her accommodations are adverse employment actions."  ECF 53-1, at 22.  Plaintiff argues that her complaints against Sgt. Hood are a but-for cause of the above-described adverse employment actions, so she has established the causation requirement.  ECF 53-1, at 23.  Plaintiff asserts that Defendant has not provided a non-retaliatory reason for the rescission.[8]  ECF 53-1, at 20.

As an initial matter, Plaintiff's reliance on this Court's previous order is misplaced.  Judge Gallagher ruled on a motion to dismiss, where the standard requires the Court to take all facts pleaded in the well-pleaded complaint as true.  *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  At the summary judgment stage, the Court uses a different standard.  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat*, 346 F.3d at 522 (quoting the pre-2007 version of Fed. R. Civ. P. 56(e)).  This point was recently made in *McCloud v. Rice*, No. 4:20CV4, 2022 WL 18146043 (E.D. Va. Dec.

---

[8] Plaintiff also argues that there is a genuine issue of fact as to her job performance.  ECF 53-1, at 24.  However, Plaintiff's job performance is not relevant for a Title VII retaliation claim, and no discrimination claims are presently before the Court.  *Compare Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (listing the elements of a discrimination claim), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 566 U.S. 30 (2012), *with Navy Fed. Credit Union*, 424 F.3d at 405–06 (listing the elements of a retaliation claim).

21, 2022).  As here, the plaintiff in that case argued that a "[m]otion for [s]ummary [j]udgment should be denied for the reasons stated by the Court in [an earlier order addressing a motion to dismiss]."  *Id.* at *6.  The Eastern District of Virginia soundly rejected that reasoning:

> A summary judgment motion filed under Federal Rule 56 utilizes an entirely different standard of review. [A] summary judgment motion is decided on the basis of the factual record, and may be granted if the Court determines that there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Thus, Plaintiff cannot defeat [Defendants'] Motion for Summary Judgment by relying on the Court's decision to deny their prior dismissal motion.

*Id.* at *7.  As in *McCloud*, Plaintiff may not simply rely on a prior court order that assumed facts as true to establish that those facts are indeed true.

At the same time, the Court is not convinced by Defendant's argument that Plaintiff did not have an accommodation because Maj. Preston was not authorized to give Plaintiff one.  The undisputed facts are that Plaintiff's superior, Maj. Preston, upon learning of Plaintiff's pregnancy, permitted Plaintiff to work half days for a full rate of pay.  Whether or not Maj. Preston was authorized to give Plaintiff such an accommodation, there is evidence that she did so.  ECF 56-6, at 26.  However, Maj. Preston did so at the early stages of the interactive process and was nonetheless permitted to require documentation from Plaintiff to substantiate an accommodation she had provisionally given.

When an employee requests an accommodation, the ADA contemplates the employer and employee engaging in an interactive process to arrive at an accommodation that is feasible for the employer and serves the employee's needs.  *Brady v. Bd. of Educ. of Prince George's Cnty.*, 222 F. Supp. 3d 459, 470 (D. Md. 2016) (citing *Allen v. City of Raleigh*, 140 F. Supp. 3d 470, 483 (E.D.N.C. 2015)).  During that process, an employer "may require" medical documentation that "(1) describes the nature, severity, and duration of the employee's impairment, the activity or

activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and, (2) substantiates why the requested reasonable accommodation is needed."   EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act. Question No. 10 (July 27, 2000), available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html; *see also* 16 C.F.R. § 1630.14(c) ("A covered entity may require a medication examination (and/or inquiry) of an employee that is job-related and consistent with business necessity. A covered entity may make inquiries into the ability of an employee to perform job-related functions.").

Thus, Defendant was permitted to require Plaintiff to produce medical records or other documentation to establish her pregnancy since that was the basis for Plaintiff's accommodation request. *See, e.g.*, *EEOC v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 106 (D. Md. 2019) ("To be sure, [the defendant-employer] could have asked [the plaintiff-employee] to produce medical records or other documentation to establish her disability."); *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020) (noting that an employer "may require documentation supporting an employee's requested accommodation").   Indeed, without documentation, Defendants were arguably not required to provide any accommodation for Plaintiff's alleged incapacity.   *Rock*, 819 F. Supp. 2d at 473 ("Thus, '[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA.'" (quoting *Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *6 (4th Cir. 1996) (table decision))); *May v. Roadway Express, Inc.*, 221 F. Supp. 2d 623, 628 (D. Md. 2002) ("While Plaintiff may have been 'flabbergasted' that Defendant did not automatically accept his own determination that he was disabled without first obtaining some medical documentation, the Court finds nothing untoward in Defendant's straightforward request for additional information.").

Maj. Preston's March 29, 2020, email requesting documentation was not a rescission of Plaintiff's provisional accommodation.  Rather, in that email, Maj. Preston merely asked for documentation to justify the accommodation that Plaintiff had enjoyed for almost two months without providing any proof of its necessity.  Plaintiff, in her own words, admits that she did not provide documentation until she replied to the email on March 31, 2020.  ECF 52-8, at 1.  Plaintiff wrote that when Maj. Preston "requested documentation for [Plaintiff's] accommodation" in an earlier phone call, Plaintiff "advised [Maj. Preston] that [Plaintiff] had a doctor[']s appointment on March 26, 2020 where [she] would request a note from  [her] doctor . . . ."  ECF 52-8, at 1.  Plaintiff then noted that "[t]hat task ha[d] been completed" with the note from her doctor's office attached to the email.  *Id.*  The doctor's note was dated March 30, 2020.   *Id.* at 2.  Thus, up until March 31, 2020, two days after Major Preston sent the email allegedly revoking Plaintiff's accommodation, Plaintiff had not provided any documentation at all supporting her requested accommodation.  On March 31, 2020, the same day Plaintiff provided that documentation, Plaintiff worked her accommodated four-hour schedule before leaving, not to return to work for nearly a year.  ECF 53-6, at 29–30, 32.  Thus, despite Maj. Preston allegedly rescinding Plaintiff's accommodation, Plaintiff continued to utilize it for a day.  After that, the record before the Court reflects that Plaintiff simply stopped coming to work.

Against that factual backdrop, Plaintiff's argument that Maj. Preston's email constitutes a rescission of an accommodation that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" must fail.  *Burlington Northern*, 548 U.S. at 68.  If it were meritorious, any requirement that an employee seeking an accommodation must provide some documentation to support such need would necessarily be an adverse employment action.  This cannot be so, as the ADA permits employers to require such documentation.  *Frazier v. Donahoe*,

No. PWG-14-3974, 2016 WL 1045853, at *7 (D. Md. Mar. 15, 2016) ("[The plaintiff] does not contend that [his employer]'s request for medical documentation was impermissible. Even if [the plaintiff] did, there is nothing inappropriate about an employer requesting medical documentation for a disability."). Here, Maj. Preston merely requested the documentation that Plaintiff had failed to provide up until that point in the interactive process. This is not a rescission.

Even viewed in the light most favorable to Plaintiff, Defendant's demand for documentation is more accurately deemed as part of the interactive process required by the ADA, a process Plaintiff abandoned on March 31, 2020. Though Plaintiff alleges that she stopped working that day because Maj. Preston "never replied to [her] e-mail" and "wouldn't speak to [her]," the fact remains that Plaintiff stopped working—and checking her department email—just four hours after providing proof of her accommodation. ECF 53-6, at 14, 30. "[E]mployers need not immediately implement or accept accommodations proposed by an employee." *Farquhar v. McCarthy*, 814 F. App'x 786, 788 (4th Cir. 2020) (quoting *Tchankpa*, 951 F.3d at 812 ). "Nor must an employer move with 'maximum speed' in addressing a request for accommodations." *Id.* (citing *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737 & n.6 (5th Cir. 1999)). Though there is "[n]o hard and fast rule" delineating responsibility for ensuring that the interactive process succeeds, "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Plaintiff's decision to abandon the interactive process by permanently leaving work just four hours after providing documentation of her disability caused a breakdown in the process and cannot form the basis for liability.

Moreover, because Plaintiff chose to walk away from the interactive process just hours after providing her documentation forces the Court to guess at whether Defendant's

accommodation, if any, might have constituted a *de facto* rescission.  *Loulseged*, 178 F.3d at 734 ("Because [the plaintiff-employee] quit before her rotation was imminent, we are forced to engage in a somewhat hypothetical enterprise—determining what accommodation or lack thereof would have been forthcoming had [the plaintiff-employee] remained at the company until the final arrangement was revealed.").  There is simply no evidence before the Court that Plaintiff's accommodation was rescinded when Maj. Preston asked Plaintiff for documentation.

Even if Defendant's request for documentation constituted a rescission of an accommodation, Plaintiff has failed to establish retaliation as the causal link between her protected activity and Maj. Preston's rescission of her accommodation.  At the summary judgment stage, a plaintiff alleging a Title VII retaliation claim need only proffer some "evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action."  *Dowe*, 145 F.3d at 657.  "Ordinarily, there must exist 'some degree of temporal proximity to suggest a causal connection.'"  *Angelini*, 464 F. Supp. 3d at 792 (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)).

It is important to note Plaintiff does not argue that the signing of a settlement agreement on March 26, 2020, related to the alleged sexual harassment was the protected activity that led to the rescission of her pregnancy accommodation just a few days later.  Moreover, Plaintiff has not provided any evidence or argument that Maj. Preston had knowledge of that settlement agreement. *Roberts v. Glenn Indus. Grp., Inc.,* 998 F.3d 111, 127 (4th Cir. 2021) ("We conclude therefore that no reasonable jury could find a causal link between [the plaintiff-employee's] harassment complaints and his termination three months later where [the employer] knew nothing of the complaints when he fired [the plaintiff-employee].").  Instead, Plaintiff claims that that revocation of the accommodation came in response to Plaintiff's "internal complaints to Major Preston against

Sgt. Hood." ECF 16, at 12; ECF 53-1, at 20 ("Maj. Preston . . . [granted] Plaintiff an unofficial reasonable accommodation only to then revoke it after two (2) months without explanation after Plaintiff reported Sgt. Hood's harassment."). However, even in Plaintiff's version of events, the complaints against Sgt. Hood were first made to Maj. Preston in November of 2019, ECF 53-6, at 37, well before the pregnancy accommodation was even provided, and further still from when it was purportedly rescinded.

"[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989)), *abrogated on other grounds by Nassar*, 570 U.S. at 360). Any temporal proximity between Plaintiff's protected activity (her complaints about Sgt. Hood in November 2019) and the alleged accommodation rescission (in late March 2020) is belied by the fact that Plaintiff actually received the accommodation between those two events in February 2020.

Even ignoring the implausible scenario in which Defendant provided Plaintiff with an accommodation with the intention of later revoking it, the alleged revocation of the accommodation occurred on March 29, 2020, or even March 31, 2020, roughly five (5) months after Plaintiff first raised complaints about alleged harassment on the job to Maj. Preston in November of 2019. ECF 52-8, at 2. "Although there is no 'bright-line rule' for temporal proximity, courts within our Circuit have found that shorter lapses of time similar to the three-month period at issue in [*Roberts*] are insufficient to infer a causal relationship without other evidence of a causal link." *Roberts*, 998 F.3d at 127 (collecting cases). Plaintiff offers no additional evidence of a causal link between the alleged rescission of her accommodation and her

November 2019 complaints about Sgt. Hood.  Thus, Plaintiff has not established a prima facie case of retaliation based on this factual scenario, and the BPD is entitled to summary judgment on this Title VII claim.

### 2.  Desk Reassignment

Plaintiff alleges that her desk was reassigned to Sgt. Hood in April of 2020 in retaliation for her filing of a complaint against Maj. Preston alleging pregnancy discrimination.[9]  Defendant argues that Plaintiff has not proffered any admissible evidence beyond her own testimony to support the allegations that Maj. Preston gave Plaintiff's desk to her alleged harasser in retaliation for Plaintiff's complaints.  ECF 52-2, at 29.  Further, Defendant contends that losing a desk is not an adverse employment action and that Plaintiff has not established a causal connection between Plaintiff's participation in a Title VII complaint and the reassignment of her desk.  ECF 52-2, at 30–31.

Just as with the accommodation rescission, Plaintiff asserts that the Court has already ruled the desk reassignment is an adverse employment action and that she has sufficiently established the causal link between her complaints about Sgt. Hood and the desk reassignment.  ECF 53-1, at 22–23.  Also, as with the accommodation rescission claim, Plaintiff ignores that Judge Gallagher's memorandum opinion addressed a motion to dismiss where all accusations must be "taken as true."  ECF 16, at 12.  Further, Plaintiff ignores that Judge Gallagher's observation came during a discussion of whether the alleged rescission of the pregnancy accommodation was motivated by retaliation and not as a definitive statement that the reassignment of a desk, standing alone, constitutes an adverse employment action.  *Id.* ("The subsequent allegation that Major Preston told

---

[9] Plaintiff's opposition memorandum appears to allege additional retaliation in the form of Sgt. Hood removing Plaintiff's property from Plaintiff's desk and failing to safeguard it.  ECF 53-1, at 22.  However, this allegation was not included in Plaintiff's complaint, which focuses solely on the reassignment of the desk to Sgt. Hood.  ECF 1, at 10 ¶ 40.

Plaintiff's accused harasser that he could take her desk, again taken as true, further supports the notion that [Major Preston] acted with retaliatory intent" when she "revoked [Plaintiff's] accommodation in retaliation for [Plaintiff's] internal complaints to Major Preston against Sgt. Hood.").

This observation was likely due to the fact that this Court has repeatedly held that removing an employee's desk is not an adverse employment action, even under the more lenient standard in cases alleging retaliation. *See Rock*, 819 F. Supp. 2d at 470–71 (citing *Toulan v. DAP Prods., Inc.*, CCB-05–2254, 2007 WL 172522, at *4 (D. Md. Jan. 17, 2007)); *Wonasue*, 984 F. Supp. 2d at 492; *Muldrow v. Blank*, No. 13-1200, 2014 WL 938475, at *10 (D. Md. Mar. 10, 2014); *Lindsey-Grobes v. United Airlines, Inc.*, No. GJH-14-00857, 2014 WL 5298030, at *10 (D. Md. Oct. 14, 2014); *Maine v. Azar*, No. GLR-16-3788, 2021 WL 3617215, at *13 (D. Md. Aug. 16, 2021). Despite this precedent, the Court acknowledges that there may be circumstances where the reassignment of an accuser's desk to her alleged sexual harasser may dissuade an employee from engaging in protected activity. This case, however, does not present such a scenario, particularly since Plaintiff was not using the desk at the time of its reassignment because she had stopped reporting to work.

As noted above, the standard for what constitutes an adverse employment action in the retaliation context is more lenient than that of the discrimination context. *See Burlington Northern*, 548 U.S. at 64. But "normally petty slights, minor annoyances, and simple lack of good manners" do not meet the more lenient definition. *Id.* at 68. The retaliation a plaintiff faces must have been "materially adverse" to the plaintiff and must cause "an injury or harm." *Id.* at 67–68; *see also id.* at 67 ("The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm."); *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015) ("[T]here [must] be an adverse employment action, which

denotes some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it.").

When Plaintiff alleges Sgt. Hood texted her about the reassignment of her desk, sometime in early April, Plaintiff had already called out of work indefinitely.  ECF 53-6, at 36 (noting that the text from Sgt. Hood came in April of 2020); *id.* at 30 (noting that Plaintiff worked just a few hours after sending Maj. Preston the note from her doctor and then called out sick); ECF 52-5, at 5 (reflecting that Plaintiff took sick leave on April 1, 2020, and then did not return to work for many months).  Plaintiff admits that she made no effort to return to work at the time of the alleged desk reassignment.  ECF 53-6, at 36.  Thus, Plaintiff acknowledges that she had no use for the desk at the time it was allegedly reassigned.   Further, the BPD's subsequent official accommodation to Plaintiff—granted in early May 2020—also included a desk in a private, secluded office.  ECF 52-13, at 2.  However, Plaintiff never attempted to use this private desk as she did not return to work for many months after receiving this accommodation.  ECF 52-5, at 8– 18.  Thus, any detriment Plaintiff faced from her desk reassignment, a desk she was indisputably not using, was not materially adverse to her employment and does not constitute "an injury or harm" as required by *Burlington Northern*.

The fact that Plaintiff apparently did not have a desk when she came back to work in March of 2021 does not strengthen Plaintiff's argument.  When Plaintiff called out sick on April 1, 2020, she did not express a return date.  ECF 53-6, at 32.  She then failed to return to work or fill out any FMLA (or other) documentation, despite efforts from the BPD to give her the necessary paperwork.  *See* ECF 52-19, at 1–2; ECF 52-23, at 1.  Plaintiff stopped checking her work-related email account.  ECF 53-6, at 14.  Plaintiff's employer had no way of knowing when (or if) Plaintiff was coming back to work.  In fact, when Plaintiff did return to work, she had been out on LWOP

status for almost a full calendar year.[10]   Maj. Preston had, by that point, not worked in the Northeastern District for many months.  ECF 53-1, at 6.  Thus, even assuming as true that Plaintiff returned to work to find she had no desk, this was not the fault of Maj. Preston. [11]

Plaintiff also appears to argue that the notice of Plaintiff's desk reassignment was retaliatory in nature because Maj. Preston "gave away" Plaintiff's desk to "the guy she knew was sexually harassing Plaintiff."  ECF 53-6, at 33.  Even assuming these facts to be true,[12] Plaintiff has failed to offer a causal connection between the notice of desk reassignment to Sgt. Hood and Plaintiff's protected activity.  As discussed above, "a 'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action' often 'negates any

---

[10] Since Plaintiff has failed to make a prima facie case of retaliation, the Court need not reach the question of whether Defendant offers a legitimate, nondiscriminatory reason for the allegedly improper actions.  *Burdine*, 450 U.S. at 253.  However, it bears noting that the EODS complaint process revealed numerous witnesses who alleged that the desk was reassigned for a legitimate, non-discriminatory reason: an actual need for other employees to use the desk.  ECF 52-7, at 12 (noting that one BPD sergeant "was aware that Sergeant Hood was in need of a desk"), 14 (noting that a lieutenant "advised that he did know that Sergeant Hood needed a desk for other supervisors to work; therefore due to [Plaintiff] being on medical leave her desk was utile [sic] for the incoming staff"), 15 (reflecting that another BPD sergeant suggested "that desk space was limited and with new additional supervisor [sic] coming in the district, desk space was needed").  Plaintiff offers no argument that this allegedly legitimate reason for the desk reassignment was pretextual.  ECF 53-1, at 17.

[11] Indeed, the BPD may have been within their rights to terminate Plaintiff's employment altogether, as BPD policy permits the BPD to fill the position of an employee out on LWOP status for more than 30 days.  ECF 52-22, at 2.  When the employee returns to work, "the BPD shall attempt to place the employee in a vacant position within the job classification formerly held by the employee."  *Id.*  But the BPD may lay off that employee "[i]f the employee cannot be reinstated within the 10-day period following expiration of the Leave of Absence Without Pay."  *Id.*

[12] Though Plaintiff testified that she saw Sgt. Hood's "property" on her former desk when she returned to work in 2021, ECF 53-7, there is no evidence before the Court that Sgt. Hood's alleged text message sent to Plaintiff in April of 2020 accurately reflects the date the desk purportedly changed hands.  Indeed, there is evidence in the record supporting the claim that Lt. Merino, not Maj. Preston, initiated the desk reassignment and decided who would use the desk after April of 2020.  ECF 53-10 at 21.

inference that a causal connection exists between the two.'" *Angelini*, 464 F. Supp. 3d at 792 (quoting *Constantine*, 411 F.3d at 501)).   A span of two-and-a-half months can be enough to "weaken significantly the inference of causation." *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003); *see also Angelini*, 464 F. Supp. 3d at 792 (finding that a lapse of three months between the protected activity and the first allegedly retaliatory incident negated an inference of causation). The desk reassignment was relayed to Plaintiff in April of 2020.  ECF 53-6, at 36.  As noted above, Plaintiff complained to Maj. Preston about Sgt. Hood's alleged sexual harassment in November 2019.  ECF 53-6, at 38.[13]  These alleged acts are too attenuated to raise an inference of causation, particularly when Plaintiff admits she had no use for the desk at the time it was reassigned.

Plaintiff has similarly failed to establish that the notice of the alleged desk reassignment—again, assuming that this came at Maj. Preston's direction—came after Maj. Preston was aware of any complaint related to pregnancy discrimination.  Plaintiff notes only that she learned of the desk reassignment through a "text message from Sgt. Hood in April of 2020[.]" ECF 53-6, at 36.  Yet Plaintiff's complaint regarding the accommodation rescission was not lodged until April 16, 2020, ECF 52-7, at 8, and thus Maj. Preston could not have known of it, or retaliated against Plaintiff for raising it, until after that date.  As such, a causal connection between the two acts is absent.

Plaintiff acknowledges in her deposition testimony—which appears to be the only evidence before the Court addressing the desk reassignment—that she was "out on medical leave" when she learned that the desk was reassigned.  ECF 53-6, at 36.  Plaintiff admits that she does not "know why [Sgt. Hood] took the desk."  ECF 53-6, at 37. Plaintiff even speculates that the real reason behind Sgt. Hood's action was that Plaintiff's "desk was better than [Sgt. Hood's desk]," which

---

[13] Again, Plaintiff has not argued that that the protected activity for which Maj. Preston allegedly retaliated against her is the signing of the settlement agreement on March 26, 2020.

would not be retaliatory in nature. *Id.* at 36.  As discussed, Plaintiff also admits that she did not

actually return to work, and thus did not even need the use of a desk, until almost a year later.

Based on the foregoing, Plaintiff has failed to establish a triable issue that her employer engaged

in unlawful retaliation when her desk was reassigned.  Summary judgment is granted in favor of

the BPD on this aspect of Plaintiff's retaliation claim.

### 3.    Phone Call from HR

Plaintiff further alleges that sometime "in April or May of 2020" after she filed her

complaint on April 16, an unknown HR employee called Plaintiff to tell Plaintiff that her

accommodation would be reinstated if she dropped her complaint against Maj. Preston.  ECF 53-

6, at 33.  Defendant argues that Plaintiff has not provided any admissible evidence that the HR

employee offered to "barter" reinstatement of Plaintiff's accommodation if she withdrew her

complaint.  ECF 52-2, at 29.  Plaintiff counters that the Judge Gallagher's memorandum opinion

addressing Defendant's motion to dismiss had already established that the alleged fact that

"Human Resources offered to 'barter' the withdrawal of Plaintiff's EEOC complaint"

unquestionably "constitute[s an] adverse employment action[] with a factual link between the

action and protected activity." ECF 53-1, at 16–17 (citing ECF 16, at 12).  Plaintiff frames the

issue as Defendant "inappropriately" shifting the burden back to Plaintiff under the *McDonnell

Douglas* framework "to prove that her allegations are true without first providing a legitimate

reason under *McDonnell Douglas*."  ECF 53-1, at 17.

For the reasons noted above, Plaintiff cannot simply rely on Judge Gallagher's prior

opinion addressing a motion to dismiss.  *Graves v. Lioi*, 930 F.3d 307, 317 (4th Cir. 2019) (noting

that there is "nothing remarkable in concluding that some plaintiffs whose claims survive a motion

to dismiss are unable to meet their burden to survive summary judgment").  Thus, the Court is

tasked with determining whether Plaintiff's deposition testimony recounting that she received "a

call from someone in HR" who advised Plaintiff "that if [plaintiff were] to close out [her] complaint again[st] Natalie Preston [Defendant] would reinstate [her] accommodation" generates a genuine issue for trial.  ECF 53-6, at 33.

"While a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Whittaker v. Morgan State Univ.*, 524 F. App'x. 58, 60 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(c)(2)).  As Judge Grimm eloquently put it, "under Fed. R. Civ. P. 56(c)(2) . . . facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the requirement is that the party identify facts that *could be* put in admissible form."  *Wake v. Nat'l R.R. Passenger, Corp.*, No. PWG-12-1510, 2013 WL 5423978, at *1 (D. Md. Sept. 26, 2013) (emphasis in original).

Plaintiff's offer of proof fails to identify the caller, the caller's specific job title, or the caller's authority to, as Plaintiff deems it, "barter" on behalf of Defendant.  ECF 56, at 11.  Plaintiff offers pure speculation that the caller (a) represented Defendant, (b) was authorized by Defendant to make the statement, or (c) made the statement on a matter within the scope of the caller's employment relationship with Defendant relationship while it existed—all requirements of non-hearsay statements under Federal Rule of Evidence 801(d)(2).  However, Defendant makes no objection to Plaintiff's offer of proof.  *See* Fed. R. Civ. Pro. (c)(2).  Accordingly, the Court will proceed with its analysis.

Even assuming the call can be produced in some admissible form at trial, Plaintiff has proffered no evidence that this unnamed employee had any knowledge of any protected activity in which Plaintiff engaged prior to filing her complaint against Maj. Preston on April 16, 2020.  It

therefore cannot be retaliatory.  *See Dowe*, 145 F.3d at 657 ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in protected activity is absolutely necessary to establish the third element of the prima facie case."); *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) ("If an employer . . . never realized that its employee engaged in protected conduct, it stands to reason that the employer did not act out of a desire to retaliate for conduct of which the employer was not aware.").  Plaintiff has provided no factual support for the assertion that the HR employee acted in retaliation for Plaintiff's prior protected activity, so it is not a triable issue.  *See Bouchat*, 346 F.3d at 526; *Felty*, 818 F.2d at 1128.

This leaves the allegation that BPD retaliated against Plaintiff for filing the April 16, 2020, complaint by offering to restore Plaintiff's accommodation if Plaintiff rescinded the complaint.  On its face, it is difficult to construe this offer as retaliatory.  As noted, Plaintiff must establish "that a reasonable employee would have found the challenged action materially adverse, which in [the retaliation] context *means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination*." *Burlington Northern*, 548 U.S. at 68 (emphasis added).  Plaintiff acknowledges that she filed her complaint with the intention having the accommodation she believed had been improperly taken away restored by Defendant.  *See* 53-6, at 33–34 ("So when I reported this incident I did say that I wanted to be at work, but I couldn't work what they were asking me to work and that I needed my accommodation reinstated.").  Plaintiff also alleges that the HR employee in question informed her that if Plaintiff "closed out [her] complaint . . . [Defendant] would go ahead and reinstate [Plaintiff's] accommodation." *Id.* at 33.  It is difficult to fathom how granting the precise remedy sought in a complaint would dissuade a reasonable worker from raising a complaint in the first place.

In addition to the fact that Plaintiff has not provided any evidence of who this employee was or when the call took place, it must also be noted that nothing ever came of the allegedly unlawful offer.  Plaintiff did not withdraw her complaint and was nonetheless granted nearly the exact accommodation she requested (five-hour workdays versus the four-hour workdays she requested) in the first week of May.  Indeed, the fact that Plaintiff was granted the accommodation promptly after raising her complaint reflects that the call was not an unlawful "bartering" at all and was instead prompted by Plaintiff's decision to re-engage in the interactive process by contacting Defendant on April 22, 2020, seeking a restoration of her pay.  ECF 52-12, at 2.  Regardless, there is no genuine issue of material fact here that warrants a trial on this issue, and the BPD is entitled to summary judgment.

Even assuming the caller had the express authority to negotiate with Plaintiff about resolving Plaintiff's EODS grievance, such "bartering," as Plaintiff deems it, is not, per se, improper.  Courts have endorsed similar offers to restore a plaintiff to a previous position in exchange for the dropping of an EEOC charge.  *Douglass v. Rochester City Sch. Dist.*, 522 F. App'x 5, 9 (2d Cir. 2013) ("Similarly, the school district's offer to extend [plaintiff-employee]'s probationary period for a second time . . . even conditioned upon the withdrawal of her EEOC charge and a release of discrimination claims, did not put her in any worse employment position than she would have been in absent the offer." (citations omitted)); *Dailey v. Lew*, No. GLR-15-2527, 2016 WL 1558150, at *7 (D. Md. Apr. 18, 2016) ("In addition, Dailey's supervisor did not request that she waive her rights to bring EEOC charges or employment discrimination claims— conduct that courts have found is not an adverse employment action—but only requested that she withdraw an existing EEOC appeal."), *aff'd*, 670 F. App'x 142 (4th Cir. 2016); *EEOC v. Nucletron Corp.*, 563 F. Supp. 2d 592, 595 (D. Md. 2008) ("An employer can offer its employee additional

31

severance benefits not already promised or owed in exchange for the employee's promise not to file a discrimination lawsuit, or for a waiver or release of his discrimination claims.").[14]  In the EEOC context, such negotiations are encouraged, if not required.  *See* 29 C.F.R. § 1614.603 ("Each agency shall make reasonable efforts to voluntarily settle complaints of discrimination as early as possible in, and throughout, the administrative processing of complaints, including the pre-complaint counseling stage.").[15]

For the foregoing reasons, Plaintiff has not established a prima facie case of unlawful retaliation based on the phone call she received from HR, so the BPD is entitled to summary judgment.

### B.    ADA

The BPD is entitled to summary judgment on Plaintiff's ADA claim as well.  Plaintiff has not specified which Title of the ADA she alleges the BPD violated, but she appears to allege a violation of Title I, which prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of

---

[14] There are circumstances, however, where the withdrawal of an offer of compromise because an employee threatened legal action constituted an adverse employment action.  For example, in *Paquin v. Federal National Mortgage Association*, the withdrawal of a proposed severance package because the plaintiff wrote a letter to supervisors threatening to assert legal rights was deemed an adverse employment action. 119 F.3d 23, 31 (D.C. Cir. 1997).  The case at bar presents an entirely different scenario as Plaintiff had already initiated a discrimination complaint and alleges only that Defendant's representative contacted her with a favorable offer to settle the matter.  Plaintiff was never asked to waive her rights to file a complaint.  Indeed, after the Plaintiff rejected the offer, not only was no adverse action taken against her, but she also soon received a substantially similar accommodation to the one she requested.

[15] In fact, an argument can be made that the Federal Rules of Evidence render such negotiations inadmissible in evaluating a motion for summary judgment.  *See* Fed. R. Evid. 408; *see also Blubaugh v. Harford Cnty. Sheriff*, No. JKB-15-1207, 2016 WL 8290619, at *6 (D. Md. Dec. 16, 2016) (finding that asking a Plaintiff to withdraw an EEOC complaint or face termination was "part of an attempted negotiated settlement" and thus inadmissible to prove retaliation), *aff'd*, 699 F. App'x 163 (4th Cir. 2017).  Defendant, however, has not raised this argument.

employees, employee compensation, job training and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).  To establish a prima facie case that an employer failed to accommodate an employee as required under the ADA, the plaintiff employee must show the following: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodation." *Wirtes v. City of Newport News*, 996 F.3d 234, 238–39 (4th Cir. 2021) (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)).  The *McDonnell Douglas* framework applies to ADA failure-to-accommodate claims.  *See Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 419 (4th Cir. 2015) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995)).

The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  "[M]ajor life activities" under the ADA include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12012(2).  Courts have previously held that "a plaintiff 'cannot state a claim under the ADA' by alleging that she was discriminated against due to her pregnancy alone, because 'pregnancy is not a disability under the ADA.'"  *Wonasue*, 984 F. Supp. 2d at 488 (quoting *Genovese v. Harford Health & Fitness Club, Inc.*, No. WMN-13-217, 2013 WL 2490270, at *5 n.3 (D. Md. June 7, 2013)).  Importantly, however, in 2008, Congress enacted the ADA Amendments Act ("ADAAA"), which expanded

the definition of "disability" under the ADA "in favor of broad coverage." 42 U.S.C. §
12102(4)(A); *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 218–19 (2015).

      In its Reply, the BPD argues for the first time that Plaintiff does not have a disability within
the meaning of the ADA but relies on cases that interpret the ADA before the 2008 amendments
took effect.  ECF 56, at 18.  Cases evaluating whether pregnancy is a "disability" under the pre-
ADAAA definition are of limited value.  *See Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d
562, 572 (4th Cir. 2015) ("In enacting the ADAAA, Congress abrogated earlier inconsistent
caselaw.").  Here, Plaintiff has offered only a letter from her doctor recommending that she work
four-hour days due to sciatica pain as evidence of her disability.  ECF 52-8, at 1.  Despite the short
nature of the letter, it is clear that Plaintiff's doctor believed that Plaintiff's ability to work was
substantially limited, as the doctor recommended that Plaintiff work only half her normal hours.
Because working is a major life activity and her ability to do so was substantially limited,
Plaintiff's pregnancy does fall within the broad post-ADAAA statutory definition of a disability.

      However, the BPD is nevertheless entitled to summary judgment on this claim because,
even if the first three elements are met, Plaintiff's employer never failed to grant her an
accommodation.  As soon as Plaintiff informed Maj. Preston that she was pregnant on February 4,
2020, Maj. Preston granted Plaintiff an informal accommodation of a four-hour workday of only
administrative duties, regardless of whether Maj. Preston was permitted to do so under the BPD's
policies.  ECF 53-6, at 25–26; ECF 52-6, at 2.  Plaintiff worked with that accommodation—despite
never having provided documentation of the need for it—for almost two full months.  Only then,
after not having received any documentation, did Maj. Preston inform Plaintiff via the March 29,
2020, email that Plaintiff had to work her entire normal shift until that documentation was received.
ECF 52-8, at 2.  Plaintiff concedes that she had provided no documentation up until that point, as

she responded on March 31 with a letter (that was dated March 30) from her doctor as proof of her pregnancy.  As discussed above in Section III.A.1, the email exchange demonstrates that Plaintiff failed to provide the medical documentation for her accommodation that Plaintiff's employer is entitled to require under the ADA.

Even after the March 29, 2020, email from Maj. Preston, Plaintiff cannot demonstrate that her employer failed to accommodate her.  On March 31, 2020, two days after Maj. Preston had requested documentation and the day Plaintiff provided it, Plaintiff worked for four hours and then never returned to work again.  ECF 52-5, at 5–18; ECF 53-2, at 15.  Stated differently, Plaintiff used the exact accommodation that she now contends was revoked.  After Plaintiff filed a complaint with EODS on April 16, 2020, and reached out to HR on April 22, 2020, about how to "start receiving pay again" as she was "currently out of work in a no pay status due to an extremely high risk pregnancy and fear of contracting COVID 19 with lack of safe working environment within the department," she was granted a formal accommodation just a couple weeks later on May 7.  ECF 52-12, at 2; ECF 52-13, at 1–2.  That formal accommodation was substantially similar to what she had requested—"five hours a day in the office" and an office "in full seclusion with no contact with other members, enforcing social distancing from other members while at work" as well as personal protective equipment.  ECF 52-13, at 1–2.  Plaintiff never utilized this accommodation and never returned to work until nearly a full calendar year later.  But the fact remains, she *was* granted an accommodation by her employer.  Because Plaintiff cannot establish a prima facie case discrimination under the ADA, the BPD is entitled to summary judgment on Plaintiff's ADA claim (Count IX).

###### C.      PDA

Defendant is also entitled to summary judgment on Plaintiff's PDA claim.  Under the PDA, a pregnant person establishes a prima facie case of pregnancy discrimination for failure to accommodate by showing "[1] that [the person] belongs to the protected class, [2] that [the person] sought an accommodation, [3] that the employer did not accommodate [the person], and [4] that the employer did accommodate others 'similar in their ability or inability to work.'"  *Young*, 575 U.S. at 229.  *McDonnell Douglas* applies in this context as well.  *Id.* at 228.  "Where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination . . . 'the similarity between comparators must be clearly established in order to be meaningful.'"  *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (quoting *Lightner v. City of Wilmington*, 545 F.3d 260, 263, 265 (4th Cir. 2008)).  There must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination."  *Id.* (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)); *see also Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) ("Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992))).

Here, it is not in dispute that Plaintiff was pregnant at the time Maj. Preston sent the March 29, 2020, email and therefore Plaintiff belongs to the protected class.  But for the same reason that Plaintiff's ADA claim fails, so too does her PDA claim.  Plaintiff was granted an accommodation,

both an informal one at the early stages of the interactive process immediately after Maj. Preston became aware of Plaintiff's pregnancy, and later, with a formal accommodation granted by HR soon after Plaintiff formally requested it from HR.  As explained above, Maj. Preston's March 29 email was not a rescission, but a permissible request for documentation as part of the interactive process.

Plaintiff's PDA claim also fails because she has not established "sufficient commonalities" between her and her chosen comparator, Lt. Trevor Curtis, from which a reasonable jury could infer impermissible discrimination.  Plaintiff argues that Lt. Curtis is a sufficiently similar comparator to Plaintiff because "the blatant difference [between the two] is Plaintiff's disability and her participation in statutorily protected activity."  ECF 53-1, at 17.  The BPD counters that Plaintiff and Lt. Curtis differ in their job performance as it relates to outstanding UOFs and in the nature of their respective disabilities.  ECF 52-2, at 28.  The BPD further argues that Plaintiff and Lt. Curtis, who was on "light duty" due to a shoulder injury, were assigned the same administrative work.  *Id.*  "In other words," BPD alleges, "Curtis actually did perform the very same administrative tasks that Plaintiff claims only she was given."  *Id.*

When Plaintiff worked under the accommodation in February and March, she was only assigned to administrative work.  Plaintiff offers nothing but conjecture that Lt. Curtis only had to perform his own administrative duties while she was made to perform those of others in her District.  Plaintiff has not provided any evidence about how Lt. Curtis requested his accommodation that would enable a factfinder to conclude that the only reason for Plaintiff's and Lt. Curtis's disparate treatment could be Plaintiff's pregnancy.  Indeed, it is possible that Plaintiff may actually have received *more* favorable treatment than Lt. Curtis, as she was afforded half her normal hours for full pay for nearly two full months despite never having provided documentation

of a medical need.  *See* ECF 52-10, at 1 ("During [his time on light duty], [Lt. Curtis] was not paid unless [he] actually worked.").

Based on the foregoing, Plaintiff has failed to establish a prima facie case of discrimination under the PDA.  Accordingly, the BPD is entitled to summary judgment on this claim (Count VIII).

### D.     FEPA

State law claims under Maryland's FEPA are analyzed under the same framework as their federal counterparts.  *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 484 n.20 (D. Md. 2013) ("Section 1981 and FEPA claims of discrimination are analyzed under the same framework as Title VII."); *Miller v. Md. Dep't of Nat. Resources*, 813 F. App'x 869, 874 (4th Cir. 2020) ("[T]he Maryland FEPA appl[ies] the same standards as the ADA."); *Linton v. Johns Hopkins Applied Physics Lab'y LLC*, No. JKB-10-276, 2011 WL 4549177 (D. Md. Sept. 28, 2011) (noting that this District applies "Title VII case law in adjudicating FEPA claims") (citing *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007)).

Plaintiff's FEPA claims necessarily fail because the analysis is the same under the federal provisions as under the FEPA.  Thus, the Court need not address whether Defendant is entitled to sovereign immunity.  Defendant is granted summary judgment on the FEPA claims.

### E.     Contract Principles

Finally, Defendant re-incorporates its arguments raised in its motion to dismiss that Plaintiff's claims are barred by contract principles related to the March 26, 2020, settlement agreement.  ECF 52-2, at 35.  In its motion to dismiss, Defendant argued that, because of a declaration Plaintiff had submitted in June 2020, the claims that occurred up until that point were also barred.  ECF 10, at 6.  Judge Gallagher has already ruled that contract principles bar claims

related to pre-March 26, 2020, conduct, but have no bearing on the claims subsequent to that date. ECF 16, at 13.  Though the Court has now disposed of all of Plaintiff's claims on the merits, the Court still reiterates Judge Gallagher's conclusion—contract principles do not mandate summary judgment in favor of the BPD.  As such, the BPD is not entitled to summary judgment on this rationale.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the BPD's motion for summary judgment, ECF 52, is granted. The prior motion, ECF 43, is denied as moot.  A separate implementing Order follows.

Dated: <u>March 28, 2023</u>                              _____/s/_____
                                                        Beth P. Gesner
                                                        United States Magistrate Judge